United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AKAYSIA PEARSON, et al., | Case No.  20-cv-05726-CRB |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| STATE OF CALIFORNIA, et al., | |
| Defendants. | |

Qualified immunity protects officers from being sued for damages unless they have violated clearly established law.  To determine whether an officer is entitled to qualified immunity, the question is not whether the officer could have handled an incident better.  Rather, the inquiry looks to the officer's action from his perspective during the incident— without the benefit of hindsight.  In this case, Plaintiffs have not shown that all reasonable officers would know that, under the circumstances that unfolded before the Defendants, pepper-spraying fighting cellmates and handcuffing a resisting inmate who was in prone position would violate the Eighth and Fourteenth Amendments.  The officers are therefore entitled to summary judgment on the Section 1983 claims in their favor.

## I.     BACKGROUND

The material facts are few and occurred within 10 minutes at the Salinas Valley State Prison.  Unless otherwise noted, these facts are undisputed.

### A.     The Incident

On June 18, 2018, at 4:25 p.m., Coltrane Pearson and his cellmate, Exzavior Gaines, had a fight.  Aragon Decl. ¶ 3 (dkt. 53-1); Hernandez Decl. ¶ 4 (dkt. 53-4); Torres-

United States District Court
Northern District of California

1    Quezada Decl. ¶ 3 (dkt. 53-9); Williams Decl. ¶ 4 (dkt. 53-11); Nix Decl. ¶ 3 (dkt. 53-8).

2    This sounded an alarm, summoning officers and medical staff to the inmates' cell.  Id.

3         Officers Williams and Hernandez arrived first and saw Gaines holding Pearson in a

4    headlock.  Hernandez Decl. ¶¶ 4–6; Williams Decl. ¶¶ 4–7.  They ordered Gaines to

5    release Pearson.  Id.  Gaines refused, so Officer Williams pepper sprayed him.  Id.  The

6    pepper spray hit both Gaines and Pearson, and it caused Gaines to release Pearson.

7    Williams Decl. ¶ 6.

8         Officers Williams and Hernandez then ordered Pearson to walk to the front of the

9    cell to be handcuffed so he could be taken for medical evaluation.  Aragon Decl. ¶¶ 4–5;

10   Hernandez Decl. ¶ 7; Williams Decl. ¶¶ 7–8.  Pearson wobbled to the front; he could not

11   be cuffed through the food port due to his unsteadiness.  Id.

12        At 4:30 p.m., Officer Williams requested the control booth to open the cell door.

13   Williams Dep. at 21:24–22:05.  When Pearson walked out of his cell, Officers Williams

14   and Aragon attempted to apply handcuffs.  Aragon Decl. ¶¶ 7–8; Williams Decl. ¶ 11.

15   Pearson, however, jerked his shoulder toward Officer Aragon, flailed his arms, and broke

16   free of Officer Williams's grasp.  Id.  Pearson "violently" turned and moved towards

17   Officer Aragon.  Aragon Dep. 44:01–09.  Officer Aragon took Pearson to the ground.  Id.

18        While on the ground, Pearson pulled his arms under his chest, moving his body

19   side-to-side and kicking his legs.  Aragon Decl. ¶¶ 8–9; Hernandez Decl. ¶¶ 9–10; Torres-

20   Quezada Decl. ¶¶ 4, 6; Williams Decl. ¶¶ 12–13.  The officers ordered Pearson to stop

21   resisting, but he did not comply.  See id.  Officers Aragon, Hernandez and Torres-Quezada

22   pulled Pearson's arms out from under his body and placed his hands behind his back while

23   Officer Williams applied handcuffs.  Id.  Pearson was still breathing at this point.  Aragon

24   Decl. ¶ 10.

25        There are snippets of different recollections of what followed seconds after.

26   According to Officers Aragon, Hernandez and Torres-Quezada, when they attempted to lift

27   Pearson off the ground, Pearson suddenly contracted his body, "aggressively" drew his

28   knees up and bucked.  Aragon Decl. ¶¶ 10–11; Hernandez Decl. ¶ 11; Torres-Quezada

United States District Court
Northern District of California

1    Decl. ¶ 7.  Officers Torres-Quezada, Aragon and Hernandez—who were holding on to

2    Pearson's biceps—said they lost grip of him.  <u>Id.</u>  They said Pearson fell and struck his

3    head on the floor.  <u>Id.</u>  Pearson vomited and became unresponsive.  Aragon Decl. ¶ 11;

4    Williams Decl. ¶ 15.  Officer Williams and Sergeant Houston did not see the other officers

5    lifting and dropping Pearson, but Officer Williams saw "Pearson thrust the middle of his

6    body upward and broke free of staff."  Williams Decl. ¶ 15; Williams Dep. at 64:1–20,

7    67:24–68:09; Houston Dep. at 52:04–17.

8         The officers rolled Pearson onto his left side, where medical staff immediately

9    checked on him.  Aragon Decl. ¶¶ 12–13; Hernandez Decl. ¶¶ 11–12; Torres-Quezada

10   Decl. ¶ 8.  Medical staff noted that Pearson was unresponsive and not breathing.  Nix Decl.

11   ¶ 6.  Medical staff conducted CPR at 4:34 p.m. (i.e., four minutes after Pearson left his

12   cell).  Pearson was pronounced dead at 5:08 p.m. <u>Id.</u> ¶¶ 7, 9.

13        **B.**    **<u>Pearson's Cause of Death</u>**

14        The parties dispute what caused Pearson's death.  The Monterey County Medical

15   Examiner performed an autopsy and discovered a ruptured plastic bindle in Pearson's

16   stomach.  Azar Decl. ¶ 3 (dkt. 53-3).  Toxicology tests revealed the presence of

17   methamphetamine (1.83 mg/L) and amphetamine (.07 mg/L) in Pearson's blood; the

18   potentially toxic range is between 0.2 and 5.0 mg/L.  Azar Decl. ¶ 11.  The Medical

19   Examiner also discovered that Pearson suffered from coronary atherosclerosis and

20   concluded that Pearson died of Acute Methamphetamine Intoxication.  <u>Id.</u> ¶¶ 8, 12.

21        Defense experts Drs. Binh Ly, Jason Tovar, and Tom Neuman opine that Pearson's

22   death was "the result of a dysrhythmia while severely intoxicated with methamphetamine,"

23   that he had coronary artery disease, and that he engaged in "extreme exertion while

24   resisting his cellmate and correctional officers."  Ly Decl. ¶ 32 (dkt. 53-5); Neuman Decl.

25   ¶ 32 (dkt. 53-7); <u>see also</u> Tovar Decl. ¶ 9 (dkt. 53-10).

26        Plaintiffs commissioned a second autopsy by Dr. John C. Hiserodt.  Pls.' Exh. 6, at

27   1 (dkt. 56-7).  Dr. Hiserodt concluded that "Pearson died as a result of probable restraint

28   asphyxia secondary to excessive force restraints including use of pepper spray and

3

prolonged restraint in a prone position, with hands cuffed and legs restrained." Id.  He noted that Pearson's "injury patterns on the body are consistent with this opinion" and that "[t]he coincidental timing of the death to the exact occurrence of the restraint maneuvers is also highly suspicious." Id.  Nonetheless, Dr. Hiserodt also stated that "it is not possible to entirely rule out that the presence of blood methamphetamine may have also contributed to or synergized with restrain maneuvers in contributing to the death." Id.

Plaintiffs' forensics expert, Dr. Bennet Omalu, opines that Pearson (1) died from restraint or positional asphyxia after correctional officers put their body weight on top of him and "pressed and compressed" his back for five to eight minutes, see Omalu Expert Report at 3, 17–18; (2) suffered chemical asphyxiation from his exposure to the OC spray, id. at 3, 17–19; and (3) was a recreational and chronic user of methamphetamine and therefore the toxic level of methamphetamine that was in his blood could not have killed him, id. at 3, 13–14.

## II.    PROCEDURAL HISTORY

On July 18, 2019, Plaintiffs—Pearson's successors—filed suit for claims arising from Pearson's death against Officers Otto Aragon, D. Delgadillo, Max Gallegos, P.R. Hernandez, Lee Martin, Alfredo Torres-Quezada, and Brian Williams ("Officer Defendants"), Compl. ¶¶ 10–16, as well as their supervisors of the prison, Sergeants Marylou Carrillo and Valencia Houston and Lieutenant Jose Ruiz ("Supervisor Defendants"), id. ¶¶ 17–19.  After three amended complaints and several rounds of motions to dismiss, the following claims remain against the Officer Defendants: Section 1983 claims under the Eighth and Fourteenth Amendments and state claims of battery, negligence for wrongful death, and violation of the Bane Act.  Plaintiffs also have a Section 1983 claim and a state negligence claim against the Supervisor Defendants, but only as to their alleged failure to train the Officer Defendants about positional asphyxia.

Pending now are Defendants' motion for summary judgment (dkt. 53) and motions in limine on Plaintiffs' police-practice and forensics expert witnesses (dkt. 54 & 55).  The Court held oral argument on March 24, 2023.

### III.   LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims."  Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  A dispute is genuine if the admissible evidence on the record "is such that a reasonable jury could return a verdict" for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material if it could affect the outcome of the case.  Id. at 248–49.  To determine whether a genuine dispute as to any material fact exists, the Court must view the evidence in the light most favorable to the non-moving party, id. at 255, but need not "scour the record in search of a genuine issue of triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Rather, the Court may rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment."  Keenan, 91 F.3d at 1279.

### IV.   DISCUSSION

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  This "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  White v. Pauly, 137 S.Ct. 548, 551 (2017) (citation omitted).

Qualified immunity includes two inquiries.  The first question is whether the officer violated a constitutional right.  The second question is whether that right was "clearly established" at the time of the alleged misconduct.  Id. at 232.  Courts are free to decide which prong to address first.  See id. at 242.  Here, the Court need not answer the first question because Plaintiffs have not satisfied the second.  That is, Plaintiffs have not identified any controlling precedent or facts making it obviously clear that the officers violated clearly established law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

A.      **Plaintiffs Do Not Show Violations of Clearly Established Law.**

A right is clearly established only if relevant precedent "ha[s] placed the . . . constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  A section 1983 plaintiff bears the burden to demonstrate that the law was clearly established. See Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 8 (2021); Olivier v. Baca, 913 F.3d 852, 860 (9th Cir. 2019).  To defeat a qualified-immunity defense, Plaintiffs generally "must locate a controlling case that 'squarely governs the specific facts at issue,' except in the 'rare obvious case' in which a general legal principle makes the unlawfulness of the officer's conduct clear despite a lack of precedent addressing similar circumstances." West v. City of Caldwell, 931 F.3d 978, 983 (9th Cir. 2019) (quoting City of Escondido v. Emmons, 139 S. Ct. 500, 503–04 (2019)).  "The [legal] precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018).

Here, Plaintiffs have not offered any controlling precedent establishing that an officer's use of pepper spray in a confined cell to separate fighting cellmates or the application of pressure on parts of a resisting inmate's body to handcuff him while he was in a prone position would violate the Eighth or Fourteenth Amendments.  Plaintiffs mainly argue that restraining individuals in chest down position poses significant risk of death by asphyxia.  Pls.' Opp. at 23 (dkt. 56).  But the Supreme Court has "repeatedly told courts . . . not to define clearly established law at [that] high level of generality." Al-Kidd, 563 U.S. at 742.  Rather, "[t]he dispositive question is whether the violative nature of particular conduct is clearly established." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).  And "[w]hile the Court would agree in general that it is obvious that application of enough weight and pressure on a prone individual can lead to the asphyxiation and death of a person, that is an improper over-generalization about what happened in this case." Perez v. City of Fresno, 591 F. Supp. 3d 725, 760 (E.D. Cal. 2022) (holding officers were "entitled to qualified immunity for Plaintiffs' Fourth Amendment claims based on pressure on Perez while he was prone").  Plaintiffs have not shown that the prison officers here had

1    "fair notice"—"in light of the specific context of the case, not as a broad general

2    proposition"—that their conduct in separating the cellmates and restraining Pearson was

3    unlawful.  See Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

4            Plaintiffs argue that Drummond v. City of Anaheim, 343 F.3d 1052, 1053 (9th Cir.

5    2003), placed the Officers on notice that their conduct was excessive and unwarranted.

6    That case is distinguishable. In Drummond, two officers brought to the ground an unarmed

7    man whom they knew suffered from mental illness.  Id. at 1054.  Although the man

8    "offered no resistance," the officers continuously applied their weight to his neck and

9    upper torso.  Id.  The man repeatedly told the officers he could not breathe, and he soon

10   fell into respiratory distress, eventually losing consciousness.  Id. at 1054–55.  The court

11   found that the officers applied severe force that resulted in compression asphyxia, id. at

12   1056, despite the minimal need for force because Drummond was not resisting and "no

13   underlying crime was at issue."  Id. at 1057.  The Ninth Circuit held that "[t]he officers—

14   indeed, any reasonable person—should have known that squeezing the breath from a

15   compliant, prone, and handcuffed individual despite his pleas for air involves a degree of

16   force that is greater than reasonable."  Id. at 1059.

17           By contrast, Pearson did not comply with the prison officers' commands when they

18   attempted to handcuff him.  See Williams Decl. ¶ 8 (dkt. 53-11 at 2).  After the cell door

19   opened, Officers Aragon and Williams "attempted to move inmate Pearson's arms behind

20   him so [they] could place him in handcuffs, but inmate Pearson thrashed his right shoulder

21   backwards in an attempt to break free."  Id. at ¶ 11.  Pearson "violently moved towards"

22   Officer Aragon, who then took Pearson to the ground.  Aragon Decl. ¶ 8 (dkt. 53-1 at 2).

23   The undisputed summary judgment evidence shows that Pearson did not comply with the

24   officers' instructions—and physically resisted—when the officers attempted to handcuff

25   him so he could be taken to medical staff.

26           And unlike in Drummond where the officers continuously applied their weight to

27   the plaintiff's neck and upper torso, 343 F.3d at 1054, the evidence here shows that the

28   Officer Defendants did not place weight or pressed on "Pearson's head, neck, back, or

torso." See Williams Decl. ¶ 14.  Officer Williams explained: "We never apply pressure straight down on someone's back because it opens up the possibility of being assaulted by that person.  We hold them on the side, and only apply enough pressure to keep them from hurting us or hurting themselves."  Id.  Pearson also did not give any indication to the officers that he could not breathe when the officers were handcuffing him.  See Aragon Decl. ¶ 10 (noting Pearson was still breathing immediately after being handcuffed).  Accordingly, the Court finds that Drummond did not give the officers notice that pepper-spraying and handcuffing Pearson under those circumstances would violate the Eighth or Fourteenth Amendments.  See A.B. v. Cnty. of San Diego, 2022 WL 1055558, at *1 (9th Cir. Apr. 8, 2022) ("Drummond does not stand for the proposition that, once a suspect stops moving, officers cannot continue holding the suspect in place [in prone position]."); id. ("Even assuming that the deputy defendants used more force than necessary to hold Birtcher in place during the final 30 seconds, we know of no clearly established law that would have put them on notice that the force they used was excessive.").[1]

Accordingly, the Officers are entitled to qualified immunity.  The Court **GRANTS** summary judgment on the section 1983 claims in the Defendants' favor.[2]

**B.    The Court Declines to Exercise Supplemental Jurisdiction.**

At the hearing, Plaintiffs said the Court should decline exercising supplemental jurisdiction over the state law claims if the federal claims are dismissed.  The Court agrees. See 28 U.S.C. § 1367(c)(3); see, e.g., Perez, 591 F. Supp. 3d at 761.

---

[1] Although Plaintiffs point out some disputed or inconsistent facts, e.g., Pearson's cause of death and whether the officers dropped Pearson, they are immaterial for purpose of analyzing whether the law is clearly established even when the facts are viewed in Plaintiffs' favor.  At the end of the day, Plaintiffs have not identified any case showing the Defendants' conduct leading up to Pearson's death violated clearly established law.

[2] The Court previously limited Plaintiffs' claims against the Supervisor Defendants "only as to their alleged failure to train the Officer Defendants about positional asphyxia." Or. on Mot. to Dismiss (dkt. 35 at 7).  The undisputed facts show that the Supervisor Defendants were not responsible for training the Officer Defendants on positional asphyxia.  See Houston Dep. (dkt. 53-6) at 64:16–65:04.  Summary judgment therefore is **GRANTED** in the Supervisor Defendants' favor.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.      CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on the Section 1983 claims (dkt. 53) is **GRANTED**.  Plaintiffs' federal claims are dismissed with prejudice.  The state law claims are dismissed without prejudice and may be pursued in the appropriate state court, if Plaintiffs are so inclined.  The pending motions in limine (dkt. 54 & 55) are denied without prejudice.

**IT IS SO ORDERED.**

Dated: April 17, 2023



CHARLES R. BREYER
United States District Judge

9